186 N.J. Super. 599 (1982)
453 A.2d 291
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN LEVI PICKETT, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided September 27, 1982.
*601 Phillip E. Miller for defendant.
Maris Konray, Asst. Prosecutor for the State (John H. Stamler, Union County Prosecutor, attorney).
LONG, J.S.C.
The issue presented here is one of first impression in New Jersey: Can evidence which was seized and ultimately suppressed as a result of a Fourth Amendment violation be considered by the Pretrial Intervention Director in evaluating an individual's application for admission to the program.
The case arose as follows: On September 10, 1981 New Jersey State Police officers on routine patrol on the Turnpike stopped a vehicle for speeding. As a result of what the officers categorized as suspicious or furtive gestures on the part of the three occupants, they were asked to exit the vehicle. A pat-down ensued as a safety measure. Weapons were found in the clothing of each of the three occupants, who were then placed under arrest and handcuffed. The officers proceeded to search the vehicle, including the trunk which yielded sealed plastic packages of suspected marijuana as well as a number of pills. Later at headquarters the officers obtained from John Pickett, the driver of the car, a written consent to the previously executed search of the trunk. Subsequently all three of the occupants, including Pickett, the subject of this appeal, were indicted by the Union County grand jury. Pickett was charged with three offenses: possession of marijuana, possession of marijuana with intent to distribute and possession of a knife.
He applied for admission to the Union County Pretrial Intervention Program (PTI) in a timely fashion and was rejected, among other reasons for the seriousness of the charges against him. This rejection was upheld on appeal. Thereafter Pickett filed a motion to suppress the evidence underlying the marijuana charges. The judge agreed that a Fourth Amendment violation had occurred and granted the motion to suppress *602 because the search of the trunk was unjustified and because the after-executed consent could not validate what had gone before. As a result, the marijuana counts were dismissed, leaving Pickett with a single outstanding charge, possession of a knife. He then reapplied to PTI, arguing that a fourth degree knife offense is not serious enough to serve as a basis for denial of admission to the program and that he should be allowed to enroll. The director disagreed, basing her decision not only on the knife charge but also on the marijuana, notwithstanding its suppression. She reasoned that in evaluating Pickett for PTI, his amenability to rehabilitation can only be measured meaningfully on the basis of all of the true facts underlying his involvement with the criminal justice system. The prosecutor approved the director's decision and this appeal ensued. The director has stipulated that if the suppressed evidence is excluded from consideration, Pickett will be admitted into the program. Thus, the disposition of this legal issue will also finally resolve Pickett's claim of entitlement to PTI, one way or the other.
Although the history of PTI in New Jersey, the policy considerations underpinning it and its procedural workings have been exhaustively outlined in State v. Leonardis, 71 N.J. 85 (1976), a brief overview of the program is necessary here in order to place this issue in perspective. N.J.S.A. 2C:43-12 et seq. and R. 3:28 of our court rules lay out the framework for the operation of supervisory treatment programs through PTI. The express purposes of PTI are to:
(1) Provide applicants on an equal basis, with opportunities to avoid ordinary prosecution by receiving early rehabilitative services or supervision, when such services or supervision can reasonably be expected to deter future criminal behavior by an applicant, and when there is apparent causal connection between the offense charged and the rehabilitative or supervisory need, without which cause both the alleged offense and the need to prosecute might not have occurred; or
(2) Provide an alternative to prosecution for applicants who might be harmed by the imposition of criminal sanctions as presently administered, when such an alternative can be expected to serve as sufficient sanction to deter criminal conduct; or
(3) Provide a mechanism for permitting the least burdensome form of prosecution possible for defendants charged with "victimless" offenses; or

*603 (4) Provide assistance to criminal calendars in order to focus expenditure of criminal justice resources on matters involving serious criminality and severe correctional problems; or
(5) Provide deterrence of future criminal or disorderly behavior by an applicant in a program of supervisory treatment. [N.J.S.A. 2C:43-12(a)(1)]
In essence, the program has two ends: to divert individuals with high prospects for rehabilitation from the traditional channels of the criminal process and to alleviate the overburdened criminal caseload by resolving appropriate cases without full-blown criminal disposition. State v. Leonardis, supra at 96. Many factors are to be considered by the director in evaluating a defendant's application for admission. Included are:
(1) The nature of the offense;
(2) The facts of the case;
(3) The motivation and age of the defendant;
(4) The desire of the complainant or victim to forego prosecution;
(5) The existence of personal problems and character traits which may be related to the applicant's crime and for which services are unavailable within the criminal justice system, or which may be provided more effectively through supervisory treatment and the probability that the causes of criminal behavior can be controlled by proper treatment;
(6) The likelihood that the applicant's crime is related to a condition or situation that would be conducive to change through his participation in supervisory treatment;
(7) The needs and interests of the victim and society;
(8) The extent to which the applicant's crime constitutes part of a continuing pattern of anti-social behavior;
(9) The applicant's record of criminal and penal violations and the extent to which he may present a substantial danger to others;
(10) Whether or not the crime is of an assaultive or violent nature, whether in the criminal act itself or in the possible injurious consequences of such behavior;
(11) Consideration of whether or not prosecution would exacerbate the social problem that led to the applicant's criminal act;
(12) The history of the use of physical violence toward others;
(13) Any involvement of the applicant with organized crime;
(14) Whether or not the crime is of such a nature that the value of supervisory treatment would be outweighed by the public need for prosecution;
(15) Whether or not the applicant's involvement with other people in the crime charged or in other crime is such that the interest of the State would be best served by processing his case through traditional criminal justice system procedures;
(16) Whether or not applicant's participation in pretrial intervention will adversely affect the prosecution of codefendants; and

*604 (17) Whether or not the harm done to society by abandoning criminal prosecution would outweigh the benefits to society from channeling an offender into a supervisory treatment program. [N.J.S.A. 2C:43-12(e)]
However, neither these criteria nor the others set forth in the statute are exhaustive or dispositive. According to the guidelines adopted by the court for PTI programs, see Pressler, Current N.J. Court Rules, Guidelines 1-8, at 511-517 (1982), notwithstanding any facts in an applicant's record which ordinarily would lead to exclusion, he should be permitted to present to the director factors tending to demonstrate his amenability to rehabilitation, showing compelling reasons justifying his admission or establishing that a decision against his enrollment would be arbitrary and unreasonable. Guideline 2. It is the director's responsibility to carefully weigh all of the objective data available in connection with an applicant so as to make the necessarily subjective judgment about his character and potential for rehabilitation which undergirds any decision to accept or reject him. This analysis is much like that which is made in connection with sentencing, where the so-called whole man is evaluated by the court in order to arrive at an appropriate disposition. State v. Phillips, 176 N.J. Super. 495 (App.Div. 1980).
It is against this backdrop that Pickett's constitutional claim must be viewed. Pickett urges that once the marijuana evidence was suppressed, the exclusionary rule enunciated in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) and applied to the states in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), precluded its use by the PTI director. This position is rooted in the decision in Silverthorne Lumber Co., Inc. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), where the Supreme Court observed that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all." 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321. In the years subsequent to Silverthorne this absolutist view of the exclusionary rule has eroded considerably. Thus, it has been held that *605 unconstitutionally seized evidence may be considered at probation revocation proceedings, United States v. Farmer, 512 F.2d 160 (6 Cir.1975), cert. den. 423 U.S. 987, 96 S.Ct. 397, 46 L.Ed.2d 305 (1975); in federal civil proceedings, United States v. Janis, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), reh. den. 429 U.S. 874, 97 S.Ct. 196, 50 L.Ed.2d 158 (1976); before the grand jury, United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); for impeachment purposes in the case of a criminal defendant who testifies at trial, Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), and for sentencing, United States v. Schipani, 435 F.2d 26 (2 Cir.1970), cert. den. 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971).
Calandra established the standard for determining whether the exclusionary rule should apply in a particular nontrial proceeding. The bedrock of this standard is the deterrent purpose underlying the rule. What Calandra adopted was a balancing test in which the need of the institution for the suppressed information is weighed against the deterrent benefits to be derived from the extension of the exclusionary rule to that particular nontrial proceeding. Applying that test to grand jury proceedings, the Supreme Court considered the historic functioning of that institution which has traditionally operated "unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial." 414 U.S. at 349, 94 S.Ct. at 620, 38 L.Ed.2d at 572. Against that the court weighed what it considered to be the rather speculative deterrent effect upon illegal police activity which might be achieved by the application of the rule. In striking the balance against extension of the exclusionary rule to the grand jury the court concluded:
Any incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal. Such an extension would deter only police investigation consciously directed toward the discovery of evidence solely for use in a grand jury investigation. The incentive to disregard the requirement of the Fourth Amendment solely to obtain an indictment from a grand jury is substantially negated by the inadmissibility of the illegally seized *606 evidence in a subsequent criminal prosecution of the search victim. For the most part, a prosecutor would be unlikely to request an indictment where a conviction could not be obtained. We therefore decline to embrace a view that would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury. [414 U.S. at 351-352, 94 S.Ct. at 621-622, 38 L.Ed.2d at 573; footnote omitted]
Thus, through the enunciation of the balancing test, Calandra provided the analytical framework for the resolution of the issue raised here.
Particularly instructive in this connection is the way in which courts have applied the Calandra test in the analogous area of sentencing. The balance has consistently been struck in favor of the use of the suppressed evidence. United States v. Larios, 640 F.2d 938 (9 Cir.1981); United States v. Lee, 540 F.2d 1205 (4 Cir.1976), cert. den. 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); United States v. Vandemark, 522 F.2d 1019 (9 Cir.1975); United States v. Schipani, 435 F.2d 26 (2 Cir.1970), cert. den. 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971). One side of the balance, the need of the sentencing judge for full information, was described in Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949):
A sentencing judge ... is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant  if not essential  to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial. [337 U.S. at 247, 69 S.Ct. at 1083, 93 L.Ed. at 1342]
The counterweight was articulated in United States v. Schipani, 435 F.2d supra, at 28: "applying the exclusionary rule for a second time at sentencing after having already applied it once at the trial itself would not add in any significant way to the deterrent effect of the rule." The pivotal factor in every case appears to have been the rather insignificant deterrent effect calculated to flow from the extension of the exclusionary rule to sentencing proceedings.
*607 This is not to say that there are absolutely no circumstances in which the exclusionary rule will apply to a sentencing. Pickett has cited the single exception to the previously articulated rule. In Verdugo v. United States, 402 F.2d 599 (9 Cir.1968), cert. den. 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971), illegally seized evidence was excluded from consideration at sentencing. There, the search occurred as part of an ongoing investigation of defendant and after enough evidence for conviction had already been obtained. What transpired was an outrageous warrantless search of defendant's house during which it was ransacked and wrecked by the police, who ultimately found additional heroin. The court precluded the use of this additional evidence at sentencing because of the ongoing investigation and because the illegal search had been conducted in express anticipation of increasing the length of defendant's sentence. In other words, no more effective deterrent was available than the application of the exclusionary rule.
But Verdugo has been narrowly construed and limited to its facts in the later case of United States v. Vandemark, supra, 522 F.2d at 1023, where the court characterized the circumstances in Verdugo as extraordinary and concluded that to have allowed the use of the suppressed evidence would have provided a "substantial incentive" for unconstitutional searches. Vandemark, like Schipani, Lee and Larios, reiterated the majority conclusion that the importance of full information at sentencing outweighed any incremental deterrent effect which might flow from the extension of the exclusionary rule to such a proceeding. A conclusion in accord with the majority rule was reached in this state in State v. Banks, 157 N.J. Super. 442 (Law Div. 1978). There the court declared that suppressed evidence may be considered at sentencing and on motion for conditional discharge pursuant to N.J.S.A. 24:21-27:
Where the sole objective in seizing evidence in good faith, but contrary to the dictates of the Fourth Amendment, is to obtain a criminal conviction and its use for that purpose has been suppressed, the policy behind the exclusionary rule has been fully satisfied. See United States v. Janis, supra, 428 U.S. at 458, 96 S.Ct. 3021. That is the case here. Such evidence may be considered on a § 27 motion *608 and for sentencing purposes. Doing so will neither license nor encourage law enforcement officials to overrun the bulwark against governmental intrusions on privacy raised by the Fourth Amendment. [at 451].
The same result should be reached here. Concededly, the search which led to the marijuana evidence was illegal, but it was not particularly intrusive. It did not involve outrageous police conduct, nor did it constitute part of the development of an ongoing case or dossier on Pickett. Moreover, it is unlikely that the police in this case engaged in an illegal search and seizure solely for the purpose of ensuring the applicant's rejection from PTI. Absent unusual circumstances such as existed in Verdugo, suppression of illegally seized evidence at trial should fully meet the deterrent aim of the exclusionary rule. If any additional deterrent effect can be said to flow from the extension of the rule to PTI, it is meager and it is against this meager benefit that the crucial need of the PTI director for full information must be weighed.
As in the case of sentencing, the difficult judgmental function which is required of the director in attempting to assess human nature in order to evaluate the potential for rehabilitation can only be aided by the free flow of information. The facts of this case demonstrate the point. For in terms of potential for rehabilitation, possession of a knife is one thing but the implications of three armed men transporting prepackaged drugs is another entirely. Like the sentencing judge, the director is "not required to wear blinders" in assessing the circumstances of the offense involved. State v. Marzolf, 79 N.J. 167, 185 (1979). Any limitation on the information available to the director would have to be justified by the serious deterrent reasons which are not present here.
Practical considerations lead to the same conclusion. As the court observed of sentencings in United States v. Lee, supra, 540 F.2d at 1211, "proceedings could be intolerably delayed and disrupted if it were necessary to determine whether every piece of information relied on by the sentencing judge had an ultimate lawful origin." This reasoning is even more persuasive in *609 the PTI arena where decisions are made at the very beginning of the criminal process and not, as in sentencing, at the end. Indeed, motions to suppress are rarely decided prior to the disposition of a PTI application. A determination as to the lawfulness of the origin of evidence before it is considered for PTI purposes would require the entire criminal process to get under way and would circumvent one of the important aims of the program. This result is not warranted.
In light of the minimal deterrence which can be calculated to flow from the extension of the exclusionary rule to PTI proceedings, the negative effect of such an application on the PTI function, and the significant practical problems which would flow therefrom, I hold the exclusionary rule inapplicable in such proceedings.